UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| UNITED STATES and STATE OF TEXAS *ex rel.* DANIEL W. ELLIOTT, M.D. and LISA A. MINSLOFF, M.D., <br><br>                 Plaintiffs, <br><br> v. <br><br> SOUTHEAST TEXAS MEDICAL ASSOCIATES, LLP; STEWARD HEALTH CARE SYSTEM; ONPOINT LAB, L.L.C.; BAPTIST HOSPITALS OF SOUTHEAST TEXAS; MUHAMMAD AZIZ, M.D.; JAMES HOLLY, M.D.; MARY CASTRO, M.D.; VIJAY KUMAR, M.D.; MICHAEL THOMAS, M.D.; SYED ANWAR, M.D.; CAESAR DEIPARINE, M.D.; RONALD PALANG, M.D.; ABSAR QURESHI, M.D.; and DEAN HALBERT, M.D., <br><br>                 Defendants. | No. 2:20-CV-00132-JRG <br><br> **DEMAND FOR JURY TRIAL** |

**RELATORS' RESPONSE TO DEFENDANT
BAPTIST HOSPITALS OF SOUTHEAST TEXAS' MOTION TO DISMISS**

Relators Daniel W. Elliott, M.D. and Lisa A. Minsloff, M.D. ("Relators") file this Response to Defendant Baptist Hospitals of Southeast Texas' ("Baptist") Motion to Dismiss. (Dkt. No. 56).

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL SUMMARY ....................................................................................... 4

    A.   Summary of Chronology.............................................................................. 5

    B.   Baptist pays SETMA remuneration as purported recruitment payments ..... 6

    C.   Relators grow concerned and decide to leave SETMA............................... 7

III.  LEGAL STANDARD ......................................................................................... 8

IV.   ARGUMENTS AND AUTHORITIES ................................................................. 9

    A.   The Complaint properly alleges the existence of a fraudulent scheme and resulting false claims.................................................................................... 9

        1.   Relators properly pled the details of the scheme ................................. 10

            a.   *Relators pled the particular details of the fraudulent scheme*..... 12

            b.   *Baptist cannot escape liability at this stage based on disputed affirmative defenses* ................................................................. 16

        2.   Relators properly pled reliable indicia of false claims........................... 18

    B.   The Complaint adequately alleges scienter................................................. 20

    C.   Relators adequately plead a claim for use for false statements or records..... 22

    D.   Relators' Complaint states a claim for conspiracy........................................ 23

    E.   Relators have pleaded sufficient facts to support Baptist's liability for reverse false claims................................................................................................ 24

    F.   The Court should not dismiss Relators' TMFPA claims............................... 25

    G.   If the Court dismisses the Complaint — which is should not — any dismissal should be without prejudice........................................................................ 26

V.    CONCLUSION.................................................................................................... 28

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................8

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
  343 F.3d 719 (5th Cir. 2003)....................................................................8, 12

*EPCO Carbon Dioxide Prod., Inc. v. JP Morgan Chase Bank, NA*,
  467 F.3d 466 (5th Cir. 2006)..........................................................................17

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
  313 F.3d 305 (5th Cir. 2002).........................................................................26

*Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009)..........................................................8-10, 18-23

*Hill v. Pepper Hamilton LLP*,
  No. 6:17-CV-021-RP, 2017 WL 10841216 (W.D. Tex. May 31, 2017) ......................17

*In re Am. Airlines, Inc. Litig.*,
  370 F. Supp. 2d 552 (N.D. Tex. 2005) ...........................................................26

*In re Katrina Canal Breaches Litig.*,
  495 F.3d 191 (5th Cir. 2007)...........................................................................8

*In re Taasera Licensing LLC, Pat. Litig.*,
  No. 2:22-CV-00468-JRG, 2023 WL 2716540 (E.D. Tex. Mar. 29, 2023) ....................1

*Martin Herend's Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*,
  195 F.3d 765 (5th Cir. 1999).........................................................................27

*Meyer v. Coffey*,
  231 F. Supp. 3d 137 (N.D. Tex. 2017) ..........................................................26

*Polk Cnty., Tex. v. Peters*,
  800 F. Supp. 1451 (E.D. Tex. 1992)................................................................2

*Sanchez v. Gomez*,
  283 F. Supp. 3d 524 (W.D. Tex. 2017)......................................................16, 20

*Stripling v. Jordan Prod. Co., LLC*,
  234 F.3d 863 (5th Cir. 2000).........................................................................27

*United States ex rel. Byrd v. Acadia Healthcare Co.,*
  Civ. A. No. 18-312-JWD-EWD, 2021 WL 1081121 (M.D. La. Mar. 18, 2021)............17

*United States ex rel. Campbell v. KIC Devel., LLC.,*
  EP-18-CV-193-KC, 2019 WL 6884485 (W.D. Tex. Dec. 10, 2019)..............................19

*United States ex rel. Colquitt v. Abbott Labs.,*
  858 F.3d 365 (5th Cir. 2017)..................................................................................................19

*United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*
  NO. 3:09-cv-00484, 2013 WL 146048 (M.D. Tenn. Jan. 14, 2013)............................10

*United States ex rel. Farmer v. City of Hous.,*
  523 F.3d 333 (5th Cir. 2008)..................................................................................................23

*United States ex rel. Govindarajan v. Dental Health Programs, Inc.,*
  No. 3:18-cv-00463- E, 2020 WL 3064712 (N.D. Tex. June 8, 2020)..........................26

*United States ex rel. Longhi,*
  575 F.3d 458 (5th Cir. 2009)..................................................................................................22

*United States ex rel. Parikh v. Citizens Med. Ctr.,*
  977 F. Supp. 2d 654 (S.D. Tex. 2013) .................................................. 10, 12, 17-18, 20

*United States ex rel. Patel v. Catholic Health Initiatives,*
  312 F. Supp.3d 584 (S.D. Tex. 2018) ...............................................................................26

*United States ex rel. Patel v. Catholic Health Initiatives,*
  792 F. App'x 296 (5th Cir. 2019) .......................................................................................26

*United States ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC,*
  565 Fed. Appx. 669 (9th Cir. 2014) ...................................................................................27

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC,*
  836 F.3d 770 (7th Cir. 2016) ................................................................................................27

*United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.,*
  843 F.3d 1033 (5th Cir. 2016)...............................................................................................24

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
  125 F.3d 899 (5th Cir. 1997).......................................................................................11-12, 22-23

*United States ex rel. Williams v. Health Mgmt. Assocs., Inc.,*
  No. 3:09-CV-130 CDL, 2014 WL 2866250, at *18 (M.D. Ga. June 24, 2014)............24

*United States ex rel. Woodard v. DaVita, Inc.*,
  Civ. A. No. 1:05-CV-227, 2011 WL 13196556 (E.D. Tex. May 9, 2011) .............. 20, 22

*United States ex. rel. Jacobs v. CDS, P.A.*,
  No. 4:14-CV-00301-BLW, 2015 WL 5698395 (D. Idaho Sept. 28, 2015) ..................... 2

*United States v. Hagen*,
  60 F.4th 932 (5th Cir. 2023) ..................................................................................... 2

*United States v. Hagen*,
  No. 3:19-CR-0146-B, 2020 WL 1929848  (N.D. Tex. Apr. 21, 2020) ..................... 2, 16

*United States v. LaHue*,
  261 F.3d 993 (10th Cir. 2001) ............................................................................... 2, 16

*United States v. Marlin Med. Solutions*,
  579 F. Supp. 3d 876 (W.D. Tex. 2022) ............................................................ 11-12, 15

*United States v. Medoc Health Servs. LLC*,
  470 F. Supp. 3d 638 (N.D. Tex. 2020) ................................................ 10, 16, 20, 23

*United States v. Shoemaker*,
  746 F.3d 614 (5th Cir. 2014) ................................................................................... 23

## OTHER AUTHORITIES

Joel Hesch, *Understanding the Revised Reverse False Claims Provision of the False Claims
  Act and Why No Proof of A False Claim is Required*, 53 UIC J. Marshall L. Rev. 461
  (2021) ....................................................................................................................... 25

## RULES AND STATUTES

31 U.S.C. § 3729(a)(1)(G) ............................................................................................ 24

42 U.S.C. § 1320a-7b(b)(2) .......................................................................................... 10

42 U.S.C. § 1320a-7b(g) ............................................................................................... 10

42 U.S.C. 1395nn(a)(2)(B), (h)(1) ............................................................................... 11

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 1

Rule 9(b) ...................................................................................................... 8-9, 12, 22

Tex. Hum. Res. Code § 36.002(13) ......................................................................... 25-26

# I.  INTRODUCTION

Notwithstanding the longstanding Fifth Circuit legal tenet that motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are "viewed with disfavor" and "rarely granted," defendants in civil cases still file them as a matter of course.[1] Where such motions are unwarranted—as in this case—they drive up litigation costs and place additional demand on the justice system's already scarce resources.

From the jump, Baptist advances its primary defense that recruitment agreements are "perfectly legal"[2] and that Relators "do not allege how or why the physician recruitment agreements are unlawful." Mot. 3 (Dkt. No. 56). Considering the first 35 pages of Relators' Complaint detail the statutory framework and the detailed facts establishing that Baptist lied about recruiting Relators to Beaumont, Baptist's reading of Relators' allegations is, at best, selectively purblind. First, Relators painstakingly explain how *Baptist did not recruit them to Beaumont at all* and the remuneration at issue only benefitted Baptist and its major referral source, SETMA. The agreements were shams. In fact, Baptist back-dated at least one document and pretended to send recruitment correspondence to Relators' prior Lubbock address (*after* Relators had signed employment agreements with SETMA and moved to Beaumont) in an attempt to make it appear that Relators were "considering establishing a . . . practice in Beaumont, Texas." Compl. ¶ 107 (Dkt. No. 2). In reality,

---

[1] *See In re Taasera Licensing LLC, Pat. Litig.*, No. 2:22-CV-00468-JRG, 2023 WL 2716540, at *2 (E.D. Tex. Mar. 29, 2023) ("In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted.").

[2] As discussed herein, Baptist's reliance on Stark Law exceptions and Anti-Kickback Statute safe harbors are disputed affirmative defenses that are not appropriate bases for dismissal under Rule 12(b)(6).

Relators had already signed three-year employment agreements with SETMA and moved to Beaumont. *Id.* ¶¶ 103-04.

Second, it should not be a controversial proposition that defendants often attempt to disguise illegal activity as "perfectly legal," including using sham agreements in many cases involving healthcare fraud violations.[3] Further, Baptist ignores (1) case law, including from this District, expressly finding that written physician recruitment agreements can be unlawful and violative of federal healthcare laws as well as (2) HHS-OIG's position (as Relators describe in Paragraph 71 of their Complaint) that recruitment agreements for the benefit of third-party referral sources (here, SETMA) are "subject to a higher degree of scrutiny *to ensure that the remuneration is not a disguised payment for past or future referrals*."[4] (emphasis added). In other words, the federal agency overseeing healthcare fraud and abuse laws has rejected Baptist's implied position that recruitment agreements are always legal so long as they are written and signed. Thus, Baptist's core legal defense fails on its face.

---

[3] *See United States v. Hagen*, No. 3:19-CR-0146-B, 2020 WL 1929848, at *10 (N.D. Tex. Apr. 21, 2020) ("But as other courts have noted, a defendant's 'attempt to camouflage an underlying agreement to exchange remuneration for patient referrals' with other purportedly legitimate agreements 'is the very conduct contemplated by the [Anti-Kickback Statute.]'" (quoting *United States v. LaHue*, 261 F.3d 993, 1005 (10th Cir. 2001); *see also United States v. Hagen*, 60 F.4th 932, 951 (5th Cir. 2023) ("[Defendants'] efforts to disguise their purchase of illegal kickbacks by structuring their payments as multiple prepaid invoices for legitimate services meets the standard for complex or intricate conduct.").

[4] *See Polk Cnty., Tex. v. Peters*, 800 F. Supp. 1451, 1456 (E.D. Tex. 1992) ("While the hospital may well have been motivated to a greater or lesser degree by a legitimate desire to make better medical services available in the community, there can be no doubt that the benefits extended to Defendant were, in part, an inducement for him to refer patients to the hospital. The Court must, therefore, find that the Agreement made the basis of this action [is illegal].");*see also United States ex. rel. Jacobs v. CDS, P.A.*, No. 4:14-CV-00301-BLW, 2015 WL 5698395, at *6 (D. Idaho Sept. 28, 2015) (finding relator's allegations of overpayment by hospital to practice under a physician recruitment agreement actionable under the False Claims Act and sufficient to defeat defendants' motions to dismiss).

Baptist then pivots, arguing Relators have not sufficiently alleged that (1) Baptist received tainted patient referrals from SETMA, (2) billed federal programs for those patients, or (3) acted with the requisite scienter. The following facts alone defeat those arguments:

(1) During Relators' employment (after the sham recruitment payments were made by Baptist to SETMA), SETMA encouraged its doctors to refer patients to Baptist Hospital (including Medicare and Medicaid patients), tracked those referrals, and even circulated internal "census" numbers of patients admitted at Baptist and its competitor, St. Elizabeth Hospital. Compl. at 4-5, 122-23.

(2) During Relators' employment (after the sham recruitment payments were made by Baptist to SETMA), Defendant Anwar emailed internally complaining that there were "so many admits" to St. Elizabeth, which he described as "not good for our relationship with [B]aptist." *Id.*

(3) Then-SETMA CEO Defendant Holly explicitly told Relators that he preferred that Dr. Minsloff admit her patients to Baptist. *Id.* at 27.

(4) SETMA and its doctors, as explained in detail in the Complaint, were extreme outliers for the number of **Medicare claims** stemming from the purported treatment of **Medicare patients** in Beaumont, and there were only two hospitals in town. *Id.* at 27, 36-54.

(5) The sham recruitment agreements prepared by Baptist (submitted by Baptist as Exhibits 1 and 2 to its motion to dismiss) *themselves* have a requirement that Relators must treat Medicare and Medicaid patients. Those sham recruitment agreements state that Relators were to repay Baptist if Relators failed to comply with Medicare or Medicaid requirements and "[Baptist's] reimbursement [was] diminished thereby." Mot. Ex. 1 at 8-9 (Sections 4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2). In other words, Baptist's own documents submitted in support of its motion to dismiss recognize that Baptist would receive SETMA referrals for Medicare or Medicaid patients and would bill for them.

(6) The sham recruitment agreements prepared by Baptist *themselves* list Relators' old Lubbock address as their address for notice, despite Baptist knowing Relators had moved to Beaumont. Mot. Ex. 1 at 10; Mot. Ex. 2 at 10.

(7) The sham recruitment agreements prepared by Baptist *themselves* show Baptist knew that payments made under the agreements could implicate federal healthcare laws and that referrals of Medicare and Medicaid patients could be

3

tainted by illegal remuneration. Mot. Ex. 1 at 9; Mot. Ex. 2 at 9. Because Relators' Complaint details the timeline of employment, how Baptist played no role in Relators' recruitment, why Baptist knew it did not recruit the physicians, and how Baptist agreed to pay SETMA anyway, Baptist knew at the time it signed the sham recruitment agreements that all federal patient referrals from SETMA would result in tainted false claims.

These reasons alone justify the Court summarily denying Baptist's motion to dismiss. To preserve their arguments, however, Relators provide additional factual details, authorities, and arguments herein.

## II. FACTUAL SUMMARY

The Complaint is straightforward. Relators signed three-year employment agreements with SETMA, moved to Beaumont, and Baptist played no role in any recruitment to Beaumont. Yet, Baptist met with Relators *after* Relators were living in Beaumont and about to start working for SETMA. Compl. ¶¶ 101-110. Baptist then drafted up sham recruiting agreements that listed Relators' old Lubbock address. Mot. Ex. 1 at 10; Mot. Ex. 2 at 10. Then, Baptist paid nearly $200,000 to SETMA (a major referral source) under fake agreements that claimed Baptist recruited Relators to Beaumont (which was not true). Compl. ¶¶ 117-119. Importantly, Relators received no benefit from Baptist—they received exactly what they had already bargained for under the existing employment agreements with SETMA. *Id.* Nor did the Beaumont community benefit from this scheme as Relators already agreed to live and work there. SETMA, on the other hand, obtained nearly $200,000, and SETMA's doctors monitored referrals to Baptist and encouraged increased referrals. *Id.* ¶¶ 117-124. Baptist, of course, benefited from those referrals and its "relationship" with SETMA. Federal and state taxpayers were left to pay the bill on tainted referrals and false claims.

A.      **Summary of Chronology.**

The below bullet points summarize the relevant events in chronological order, for ease of reference.

- Summer 2014: Relators, nearing the end of their residencies in Lubbock, Texas, learn about a medical practice in Beaumont referred to as SETMA and begin discussing potential employment with the then-CEO of SETMA, Defendant Dr. Holly. Compl. ¶¶ 91-92.

- September 2014: Dr. Holly emails Relators articles and other links with information about SETMA. *Id.* ¶ 93.

- October 18, 2014: Relators meet with Dr. Holly at SETMA's office in Beaumont. *Id.*

- December 18, 2014 through January 6, 2015: Dr. Holly answers Relators' questions related to potential employment, including that SETMA (1) would prefer Dr. Minsloff "admit [patients] to Baptist" and (2) would pay each Relator a $10,000 sign on bonus. *Id.* ¶ 95.

- **January 8, 2015: Relators accept SETMA's offer of employment and SETMA's Rick Bryant sends Relators their employment contracts.** *Id.* ¶ 97.

- **February 2015: Relators sign the three-year employment contracts and send them back to SETMA.** *Id.*

- May 2015: Relators put an offer on a house in Beaumont, which was accepted. *Id.* ¶ 99.

- June 22, 2015: Holly approves the early payment of Relators' sign-on bonuses. *Id.* ¶ 100.

- June 26, 2015: A moving company confirms that Relators' belongings would be packed and moved to Beaumont beginning July 1, 2015. *Id.*

- July 7, 2015: Mr. Bryant at SETMA emails Relators to inform them that SETMA had made preparations for Relators to begin their jobs in August 2015. *Id.* ¶ 104.

5

- July 14, 2015: Baptist's Director of Physician Recruitment, Michelle Wiltz, emailed Mr. Bryant at SETMA, explaining she had "not heard from either doctor." *Id.* ¶ 105.

- July 14, 2015: Mr. Bryant emails Relators asking them to respond to Ms. Wiltz because she "represents Baptist and needs to get some paperwork completed so [SETMA] can get [Relators'] bonuses paid to [SETMA]." *Id.*

- **July 15, 2015: Ms. Wiltz emails Relators so called "LOIs," back-dated June 30, 2015, and addressed to Relators' prior Lubbock address. The LOIs pretend Relators are still "considering establishing . . . a practice in Beaumont, Texas." *Id.* ¶ 107.**

- July 22, 2015: Ms. Wiltz emails Relators with proposed recruiting agreements for Relators' review. *Id.* ¶ 108.

- Early August 2015: Relators begin employment with SETMA. *Id.* ¶ 7.

- August 19, 2015: The Recruitment Agreements are fully executed. *Id.* They purport to show Relators' address for notice in Lubbock. Mot. Ex. 1 at 10; Mot. Ex. 2 at 10.

## B.    Baptist pays SETMA remuneration as purported recruitment payments.

Per the pretend recruitment agreements, Baptist agreed to pay SETMA up to $7,500 a month for the first 12 months of Relators' employment, for a total of $90,000. Compl. ¶ 118. In other words, Baptist stepped in to cover costs that SETMA had already agreed to incur when SETMA agreed to employ Relators. *Id.* Baptist ended up paying SETMA $82,500 to recruit physicians Baptist knew did not need to be recruited. *Id.*

Baptist's records also show that it paid SETMA an additional amount of approximately $95,544 under the auspices of recruiting Relators to Beaumont. *Id.* ¶ 119. Again, SETMA already had employment agreements with Relators under which SETMA had incurred these salary obligations. *Id.* Baptist stepped in later and agreed to cover some of SETMA's preexisting wage obligations. *Id.*

6

Once Relators started their employment with SETMA, they learned that SETMA was encouraging its doctors to refer patients (including Medicare and Medicaid patients) to Baptist. *Id.* ¶¶ 4-5, 122. In fact, SETMA's management would frequently circulate internal emails showing the "census" numbers of patients admitted at St. Elizabeth Hospital and Baptist. *Id.* ¶ 122. On February 26, 2017, after receiving one of these emails, Defendant Syed Anwar, M.D. replied, "Why are there so many admits in St. Es? ***This is not good for our relationship with [B]aptist[.]*" *Id.* (emphasis added).

### C.   Relators grow concerned and decide to leave SETMA.

Relators became increasingly concerned about the conduct described above (in addition to other misconduct at SETMA). *Id.* ¶ 182. Relators were new to the practice of medicine, but they began to suspect SETMA and many of its physicians were engaged in healthcare fraud. *Id.* Relators determined that they could no longer be affiliated with SETMA, and they decided to leave. *Id.*

On December 12, 2016, Relators sent letters to Dr. Holly informing SETMA of their decision to resign. *Id.* ¶ 183. Two days later, on December 14, 2016, Dr. Holly emailed Relators copying SETMA's "Executive Management." *Id.* ¶ 184. Dr. Holly explained that Relators had a 36-month obligation to both SETMA and Baptist. *Id.* Dr. Holly instructed Relators to discuss their "binding [recruiting agreement] obligation to Baptist" with Baptist, claiming that "SETMA is not a party to it." *Id.* This, of course, was also false. *Id.* ¶ 118.

In February 2017, Baptist's attorney sent demand letters to Relators claiming, among other things, that if they were to "foolishly decide" not to fulfill the sham recruitment agreements, Relators would be sued for potentially hundreds of thousands of dollars. *Id.* ¶

185. Relators, still concerned that SETMA and its providers were committing healthcare fraud, resigned and left Beaumont. *Id.*

### III.   LEGAL STANDARD

The Complaint must contain sufficient factual matter to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)). It must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In ruling on motions to dismiss, courts "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotation omitted).

Rule 9(b)'s heightened standard applies to complaints under the False Claims Act (FCA). *Grubbs*, 565 F.3d at 186. But "Rule 9(b) does not reflect a subscription to fact pleading and requires only 'simple, concise, and direct' allegations of the circumstances constituting fraud[.]" *Id.* (quoting Fed. R. Civ. P. 8(d)(1)). Generally speaking, "Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).

Although Rule 9(b) applies to FCA claims, the Fifth Circuit explained in *Grubbs* that Rule 9(b)'s usual "'time, place, contents, and identity' standard originated in common law fraud and securities fraud cases making it no surprise that the elements of those claims match the pleading standard's requirements." 565 F.3d at 188. However, because FCA claims do not involve the same elements of reliance and damages, "a claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane in

meeting the requirement of 'stating with particularity' the contents of the fraudulent representation." *Id.* at 189. "In sum, the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Id.* at 190.

For this reason, the Fifth Circuit in *Grubbs* adopted a "workable construction of Rule 9(b)" that is unique to FCA cases, "one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud." *Id.* at 190. To satisfy the *Grubbs* test, the complaint must "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

In *Grubbs*, the Fifth Circuit specifically addressed the level of detail regarding billing that need be pled (and ultimately proven) to sustain a claim under the FCA:

> [T]he exact dollar amounts fraudulently billed will often surface through discovery and will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty. Nevertheless, a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted. To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.

*Id.* at 189-90 (citations omitted).

## IV.    ARGUMENTS AND AUTHORITIES

### A.    The Complaint properly alleges the existence of a fraudulent scheme and resulting false claims.

Baptist argues that the Complaint fails to identify false claims because it does not identify any "relevant referrals" that resulted from the unlawful remuneration[5] or any

---

[5] It is unclear if Baptist is arguing that the Complaint fails because Relators have not adequately alleged that any referrals were actually made as a result of the payments. Mot. 16 ("Absent a referral of a Medicare or

claims that were submitted to Medicare or Medicaid as a result. Mot. 16. Baptist relies heavily on *United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.* to support this argument. NO. 3:09-cv-00484, 2013 WL 146048, at * (M.D. Tenn. Jan. 14, 2013). But as one Texas court explained, "[the *Dennis* court] relied on a more stringent standard for pleading presentment of false claims, ***a standard that the [Fifth Circuit] expressly rejected.***" *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 672-73 (S.D. Tex. 2013) (emphasis added).

Rather, under the relevant standard, a relator adequately alleges the existence of false claims by pleading "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. The Complaint easily satisfies the *Grubbs* test because it plausibly alleges (1) the particular details of the scheme via the who, what, where, when, and how of the fraudulent scheme and (2) specific factual allegations that give rise to a strong inference that false bills were submitted.

### 1. Relators properly plead the details of the scheme.

Relators have sufficiently pleaded that Baptist presented false claims to the government through patient referrals tainted by a scheme whereby Baptist paid SETMA

---

Medicaid patient unlawfully induced by the . . . Recruitment Agreements, there is no violation of either AKS or Stark."). To the extent Baptist is making that argument, it is wrong. Courts have held that "[t]he AKS's plain language . . . makes it unlawful for a defendant to pay a kickback with the intent to induce a referrals, whether or not a particular referral results." *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 650 (N.D. Tex. 2020) (citation omitted). For purposes of this response, Relators construe Baptist's argument as relating to the submission of a false claim under the *Grubbs* standard. *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("As long as Relators plead with particularity that [defendant] made kickbacks with the intent of inducing referrals, and they plead 'particular details of a scheme . . . paired with reliable indicia that lead to a strong inference that claims were actually submitted,' the separate elements of the AKS and FCA are satisfied."). In any event, as shown herein, Relators have pleaded the existence of referrals to Baptist.

unlawful remuneration (disguised as recruiting payments) in exchange for referrals in violation of the Stark Law and the Anti-Kickback Statute. The Complaint details the relevant prohibitions of the Stark Law and the Anti-Kickback Statute. Compl. ¶¶ 64-79.

At its core, the Stark Law bars entities from submitting claims to federal health care programs if the "designated health services" forming the basis of the claims were furnished pursuant to referrals from physicians with which the entities had a financial interest. *See* 42 U.S.C. 1395nn(a)(1). As explained in the Complaint, "designated health services" include both inpatient and outpatient hospital services. Compl. ¶ 74. Remuneration paid by Baptist to SETMA creates a "compensation arrangement" financial interest under the Stark Law. 42 U.S.C. 1395nn(a)(2)(B), (h)(1).

The Anti-Kickback Statute provides criminal penalties for "knowingly and willfully offer[ing] or pay[ing] any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). And per statute, "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim." 42 U.S.C. § 1320a-7b(g). In other words, "[c]laims submitted in violation of the Anti-Kickback Statute are *per se* false or fraudulent claims under the FCA." *United States v. Marlin Med. Solutions*, 579 F. Supp. 3d 876, 886 (W.D. Tex. 2022).

Additionally, falsely certifying compliance with the Stark Law or the Anti-Kickback Statute —compliance with which is a condition of payment for Medicare and Medicaid— constitutes a false claim. *United States ex rel. Thompson v. Columbia/HCA Healthcare*

*Corp.*, 125 F.3d 899, 901-02 (5th Cir. 1997). Thus, any claim presented to Medicare or Medicaid by Baptist based on a tainted referral from SETMA is a false claim.

### a.   *Relators plead the particular details of the fraudulent scheme.*

The Complaint adequately alleges the "who, what, when, where, and how" of the fraudulent scheme, and therefore, meets the particularity requirements of Rule 9(b). *See Benchmark Elecs.*, 343 F.3d at 724.

*Who?* The Complaint alleges that Dr. Holly, the then-CEO of SETMA, recruited Relators to join SETMA after Relators completed their respective residencies. Compl. ¶¶ 92-97. The Complaint further alleges that *after* Relators accepted their offers of employment with SETMA and moved to Beaumont, Michelle Wiltz, the Director of Physician Recruitment at Baptist, facilitated Realtors' execution of the sham Recruitment Agreements. *Id.* ¶¶ 101-09. Finally, the fake recruitment agreements, which Baptist contends are "part of the pleadings," Mot. 4, were signed by David N. Parmer, the Chief Executive Officer of Baptist, Mot. Ex. 1 at 15, 19; Mot. Ex. 2 at 15, 19.

*What?* As alleged in the Complaint, Baptist (a hospital) prepared sham recruitment agreements and conspired to pay SETMA (a major referral source) unlawful and unjustified remuneration resulting in, and in exchange for, tainted patient referrals. Compl. ¶¶ 118-19; 123 ("At least one purpose of the financial relationship between SETMA and Baptist . . . was to influence referrals from SETMA to Baptist."). This arrangement violated the Anti-Kickback Statute, the Stark Law, and Texas law. *Id.* ¶ 124. As a result, all claims for payment based on the treatment of government patients referred by SETMA to Baptist are false claims. *Marlin Med. Solutions*, 579 F. Supp. 3d at 886.

*Where?* The allegations relevant to Baptist's role in the scheme occurred in Beaumont, Texas. *See, e.g., id.* ¶ 95 n.5 (noting Baptist is a Beaumont hospital). Other relevant conduct—including SETMA's recruitment of Relators—occurred in Lubbock, Texas. *See, e.g.,* ¶¶ 91-92. Baptist also included a false prior address in Lubbock as the appropriate place for notice to Relators. Mot. Ex. 1 at 10; Mot. Ex. 2 at 10.

*When?* The conduct detailed in the Complaint occurred from the summer of 2014 to May 2017. Compl. ¶¶ 7, 17, 91-93, 95, 97, 99, 100-01, 104-05, 107-08, 122, 183. The Complaint does not allege that the payments made from Baptist to SETMA under the sham recruitment agreements were ever returned to Baptist. *See generally id.* Any referrals from SETMA or its providers to Baptist are or were tainted until, at a minimum, the time at which SETMA returned the unlawful remuneration (which Relators have not alleged ever occurred). *See id.*

*How?* Baptist perpetrated the scheme via the sham recruitment agreements. *See id.* ¶¶ 102-124. Per the Complaint, Baptist and SETMA had a "relationship" before Relators knew anything about it. *Id.* ¶ 113. Despite the fact that Relators already lived in Beaumont and had signed three-year employment agreements, Baptist drafted and pushed fake recruitment agreements containing lies that Baptist was seeking to induce the doctors to move to Beaumont. *Id.* ¶¶ 97, 99, 101, 107.

Baptist played no role in recruiting Relators. *See id.* Indeed, the purported recruitment agreements were not fully executed until *after* Relators began working at SETMA. *Id.* ¶ 7. Yet the agreements include covenants that read as follows:

> [Baptist], having determined that it is necessary to provide assistance and incentives in order to recruit [Relators] to locate a new private medical

13

> practice to [Baptist's] Service Area for the benefit of the community served by [Baptist], agrees as follows . . .

*Id*. ¶ 111. This covenant makes no sense based on the timeline of events. Relators had already moved to Beaumont and started work at SETMA before Baptist signed the agreements. *Id*. ¶¶ 7, 111. Baptist did not need to provide any "assistance or incentives" to convince Relators to do ***exactly what they had already done*** before Baptist was in the picture. *See id*. Perhaps aware of the illegality of the remuneration to be paid to SETMA, Baptist emailed Relators the so-called LOIs, addressed them to Relators' prior Lubbock address, and ***back-dated them to June 30, 2015***. *Id*. ¶ 107. Baptist further included Relators' prior Lubbock address in the agreements themselves. Mot. Ex. 1 at 10; Mot. Ex. 2 at 10.

Ultimately, per the sham recruitment agreements, Baptist paid nearly $200,000 to SETMA for no other purpose than to benefit a major referral source. *Id*. ¶¶ 117-24. Because a significant portion of SETMA's patients were Medicare and Medicaid patients, those referrals would necessarily implicate claims to government payors. *Id*. ¶ 3. Relators never alleged that the referral scheme between SETMA and Baptist excluded government patients—because it did not do so. As explained above, Baptist knew it would receive government patient referrals from SETMA after paying unjustified amounts to SETMA because Baptist included relevant Medicare and Medicaid provisions in the sham agreements. Baptist even included provision purporting to require Relators to *repay* Baptist if Medicare or Medicaid reduced Baptists' payments on Relators' patient referrals. Mot. Ex. 1 at 8-9 (Sections 4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2).

In return, the Complaint alleges that SETMA, through its providers, referred patients to Baptist. To start, Relators explain the arrangement between SETMA and Baptist "made no business sense unless Baptist . . . had an expectation of referrals." Compl. ¶ 111. Moreover, Dr. Holly told Dr. Minsloff that SETMA would prefer she admit patients at Baptist and that she would be on staff at Baptist. *Id.* ¶ 112. And perhaps most tellingly, SETMA encouraged its doctors to refer patients to Baptist (which would be to the detriment of Baptist's local competitor hospital). *Id.* ¶ 122. Indeed, SETMA's management would frequently circulate internal emails showing the "census" numbers of patients admitted at St. Elizabeth and Baptist. *Id.* On February 26, 2017, after receiving one of these emails, Defendant Dr. Anwar replied, "Why are there so many admits in St. E's? ***This is not good for our relationship with [B]aptist.***"[6] *Id.* (emphasis added).

Armed with these facts, it is unclear how Baptist contends that "the Complaint does not allege that any referral of a Medicare or Medicaid patient was *ever* made to Baptist . . . by anyone at SETMA." Mot. 16 (emphasis in original). Baptist appears to be arguing that every internal census email must have reflected zero patients admitted to Baptist. This is a facially unreasonable inference. Why would SETMA circulate census emails at all if they reflected only patients admitted to St. Elizabeth's? How did Dr. Minsloff manage to admit zero patients to Baptist after Dr. Holly specifically directed she admit patients there? Why would SETMA's relationship with Baptist even be on Dr. Anwar's radar?

---

[6] Perhaps recognizing the significance of this email, Baptist tries to write it off as having "no probative value" because it was sent after Relators had informed SETMA and Baptist of their "intention to leave SETMA and breach the Physician Recruitment Agreements." *See, e.g.*, Mot. 20 n.20. This argument about the strength of evidence lacks merit, particular at this stage. The money had already changed hands and the deed was done. *See* Compl. ¶¶ 111, 118-19. Unless and until that money was returned from SETMA to Baptist, all referrals remained tainted, and all resulting claims are therefore false under the False Claims Act. *See Marlin Med. Solutions*, 579 F. Supp. 3d at 886.

The "reasonable inference," which the Court is to make in Relators' favor on a motion to dismiss, is that SETMA and its providers referred government payor patients to Baptist (as Baptist anticipated in the sham agreements) during the relevant time period. *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 538 (W.D. Tex. 2017) ("The Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor when deciding a motion to dismiss."). At a minimum, the facts pleaded and the agreements themselves constitute reliable indicia that SETMA patients were referred to Baptist.

### b. *Baptist cannot escape liability at this stage based on disputed affirmative defenses.*

Baptist argues that Relators have failed to plead particular details of a scheme to submit false claims because "physician recruitment agreements are not unlawful." Mot. 18. As explained in the Introduction section above, illegal remuneration cannot be washed clean by preparing an agreement to make the remuneration appear legitimate. *See United States v. Hagen*, No. 3:19-CR-0146-B, 2020 WL 1929848, at *10 (N.D. Tex. Apr. 21, 2020) ("But as other courts have noted, a defendant's 'attempt to camouflage an underlying agreement to exchange remuneration for patient referrals' with other purportedly legitimate agreements 'is the very conduct contemplated by the [Anti-Kickback Statute.]'") (quoting *United States v. LaHue*, 261 F.3d 993, 1005 (10th Cir. 2001). It is indeed unlawful to pay remuneration to a healthcare referral source under fake recruitment agreements like those in this case.

In any event, Baptist's attempt to rely on Stark Law exceptions or Anti-Kickback Statute safe harbors constitute affirmative defenses. *See Medoc Health Servs.*, 470 F. Supp. 3d at 651 (explaining that Anti-Kickback Statute safe harbors are affirmative defenses); *see*

16

*also Parikh*, 977 F. Supp. 2d at 668-69 (explaining Stark Law exceptions are affirmative defenses). And affirmative defenses cannot serve as bases for dismissing a complaint unless the defenses "appear on the face of the complaint." *Hill v. Pepper Hamilton LLP*, No. 6:17-CV-021-RP, 2017 WL 10841216, at * 10 (W.D. Tex. May 31, 2017) (quoting *EPCO Carbon Dioxide Prod., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006)). Here, they do not.

In fact, Relators specifically allege that "[Baptist's] conduct forming the basis of this action ***does not enjoy the protection of any safe harbor***" and "***did not satisfy the elements required to meet [the] Stark Law exception***" for physician recruitment agreements. Compl. ¶¶ 70, 77 (emphasis added). Relators further allege that "[i]nstead of being bona fide recruiting agreements designed to draw doctors to an underserved area of the country, the agreements were actually intended to benefit SETMA and Baptist . . . financially." *Id*. ¶ 8.

Based on these allegations, it is certainly not apparent "from the face of the Complaint" that the sham agreements were lawful. *See Hill*, 2017 WL 10841216, at *10. Therefore, for purposes of Baptist's motion, it is irrelevant whether or not the recruitment agreements complied with the Anti-Kickback Statute safe harbor or the Stark Law exception for physician recruitment. *See United States ex rel. Byrd v. Acadia Healthcare Co.*, Civ. A. No. 18-312-JWD-EWD, 2021 WL 1081121, at *31 (M.D. La. Mar. 18, 2021) ("Relator need not prove at the pleading phase that [an exception to the Stark Law or an Anti-Kickback Statute safe harbor] does not apply.").[7] Baptist can try to prove those

---

[7] Incredibly, Baptist argues that it cannot be liable for any wrongdoing because the sham recruitment agreements say that the agreements do not impose any referral obligations. Mot. 19. Baptist further argues that Relators have "not allege[d] those provisions were not followed." *Id*. Not so. The Complaint is rife with allegations that SETMA made referrals to Baptist in exchange for remuneration. *See, e.g.*, Compl. ¶ 123

affirmative defenses later. At this point, Relators have alleged with particularity that the recruitment agreements were shams in furtherance of a conspiracy to violate the Anti-Kickback Statute, the Stark Law, the False Claims Act, and Texas law. *See supra* 13-16. For these reasons, Baptist's attempt to escape liability at this juncture based on the purported legality of the agreements must fail.

### 2.   Relators properly plead reliable indicia of false claims.

At the second step of the *Grubbs* test, a complaint "need not identify particular claims resulting from the . . . scheme," but instead need only allege "reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) (quoting *Grubbs*, 565 F.3d at 190). And the context of the referral scheme and defendants' business matters. Here, Baptist, one of two hospitals in Beaumont, received referrals from SETMA (a major referral source with many Medicare and Medicaid patients) *for years* after it had unlawfully paid remuneration to SETMA. Compl. ¶¶ 3, 117-24. Baptist asks the Court to make the unreasonable inference that it did not bill government payors for any of those referrals during that entire time.

But, as explained above, Baptist's anticipation of government patients referred by SETMA doctors and Baptist's billing for those patients is actually documented in black and white at multiple places in the sham recruitment agreements. Mot. Ex. 1 at 8-9 (Sections

---

("[R]eferrals to Baptist . . . were tracked and encouraged by SETMA"); *id.* ¶ 8 ("In exchange for remuneration paid by Baptist . . . , SETMA's managers encouraged its employee practitioners to make referrals to Baptist . . . , including for Medicare and Medicaid patients."). Baptist's request to be dismissed from this lawsuit because it said it would comply with the law in agreements that themselves were fake finds no support in the law or commonsense.

4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2). Relators allege that Baptist participates in Medicare and Medicaid, and the sham agreements recognize that fact. Compl. ¶ 53; Mot. Ex. 1 at 8-9 (Sections 4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2). As the Fifth Circuit has explained, a court can draw a strong inference that a hospital such as Baptist submitted claims to Medicare or Medicaid simply because "[n]early every hospital in America participates in Medicare and would most likely have billed Medicare [had it performed procedures on tainted referrals]." *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 372 (5th Cir. 2017).

Indeed, it is "difficult to imagine" that Baptist would have participated in the scheme and unjustifiably paid SETMA significant remuneration but failed to submit claims for payment. *United States ex rel. Campbell v. KIC Devel., LLC.*, EP-18-CV-193-KC, 2019 WL 6884485, at *15 (W.D. Tex. Dec. 10, 2019) (citing *Grubbs*, 565 F.3d at 190). Particularly so here where SETMA maintained a census of patients admitted to Baptist and monitored those admissions to ensure the protection of its "relationship with Baptist." Compl. ¶ The details in the Complaint also show that SETMA and many of its physicians were extreme outliers in regard to their claims for Medicare and Medicaid patients. The only reasonable inference under the circumstances—a mid-sized city in southeast Texas with two hospitals— is that Baptist received Medicare referrals from SETMA and submitted claims for payment for all patients referred by SETMA during the relevant time period (as Baptist anticipated in writing under the sham agreements themselves).[8]

---

[8] For these reasons, Baptist's repetitive argument that "Relators fail to state a claim for false payment" also fails. Mot. 26.

### B.    The Complaint adequately alleges scienter.

Baptist asks the Court to dismiss all claims against Baptist because Relators supposedly have not alleged scienter. The Court should summarily reject Baptist's request. "[A] plaintiff may satisfy the FCA's scienter requirement with general allegations, as long as he sets forth specific facts supporting an inference of fraud." *United States ex rel. Woodard v. DaVita, Inc.*, Civ. A. No. 1:05-CV-227, 2011 WL 13196556, at *8 (E.D. Tex. May 9, 2011). Relators have alleged *specific* facts regarding scienter, including that Baptist disguised illegal remuneration to SETMA as legitimate recruitment payments when Baptist knew it did not recruit Relators. *See* Compl. ¶¶ 189, 197, 202, 205, 210, 218, 225. Relators have similarly adequately alleged particular facts regarding Baptist's knowledge of the Stark Law and the Anti-Kickback Statute. *See id.* Courts have denied motions to dismiss based on scienter in similar cases. *See United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 658 (N.D. Tex. 2020) ("The facts alleged in the Complaint—claiming that the Medoc Defendants were familiar with anti-kickback laws, recognized that they were receiving payments for federal referrals, and funneled the payments through other corporate entities *to disguise them*—adequately allege the necessary *scienter*.") (bold emphasis added).

Here, Relators allege that Michelle Wiltz, Baptist's Director of Physician Recruitment, pushed the sham agreements on Relators even though Ms. Wiltz knew that Baptist played no role in Relators' recruitment.[9] *See* Compl. ¶¶ 101-08. Relators further allege that Baptist's CEO, David Parmer, signed the agreements *after* Relators had already

---

[9] Given Ms. Wiltz's role as Director of Physician Recruitment for Baptist, it is reasonable to infer that she would have known if Baptist had, in fact, recruited Relators. *See Sanchez*, 283 F. Supp. 3d at 538 ("The Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor when deciding a motion to dismiss.").

begun their employment with SETMA. *Id.* ¶¶ 7, 111. Contrary to Baptist's argument, this is not an instance where Baptist may have "inadvertently and in the normal course of business" submitted claims rendered false by doctor conduct. *See* Mot. 24 (citing *Grubbs*, 565 F.3d at 192). In *Grubbs*, the court dismissed claims against a hospital where the relator had not alleged that the hospital was vicariously liable for the actions of providers. 565 F.3d at 192. Here, Relators are not attempting to hold Baptist liable for the acts of its providers. Rather, Relators allegations implicate Baptist executives—including its CEO— who were acting on behalf of Baptist. Indeed, Baptist appears to concede, for purposes of its motion, that Ms. Wiltz was "acting on behalf of Baptist." Mot. 8. Similarly, the sham recruitment agreements—which Baptist attached to its motion—are signed by David N. Parmer, the CEO, on behalf of Baptist. Mot. Ex. 1 at 15, 19; Mot. Ex. 2 at 15, 19.

Additionally, the recruitment agreements drafted by Baptist contain language that establishes Baptist's actual knowledge that federal healthcare laws applied to the remuneration paid to SETMA and implicated government patient referrals. *See* Mot. Ex. 1 at 8-9 (Sections 4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2). Relator's have already presented sufficient evidence of Baptist's knowledge of federal and state healthcare laws and the illegal nature of sham recruitment payments in order to succeed ***at trial***. Relators easily meet the relaxed pleading standard for knowledge at the motion to dismiss stage.

Moreover, Baptist's scienter is implicit in the allegations. Rational economic actors do not pay nearly $200,000 to obtain a result that has already occurred. Why, then, did Baptist pay SETMA for something Baptist knew had already happened? In healthcare, financial transactions that are unnecessary or gratuitous are the hallmark of fraud. Baptist's

21

knowledge of wrongdoing is glaring, and its Rule 9(b) arguments lack merit. For these reasons, Baptist's argument as to scienter should be rejected. *Woodard*, 2011 WL 13196556, at *8 (declining to dismiss a False Claims Act claim based on a scienter argument where the relator alleged particular facts as to fraud).

### C. Relators adequately plead a claim for use for false statements or records.

To plead a claim for a "false records" violation, a relator must plausibly allege (1) the making or use of a false record or statement; (2) made with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money. *See United States ex rel. Longhi*, 575 F.3d 458, 467 (5th Cir. 2009). Put simply, the relator must allege that "the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid by the government." *Grubbs*, 565 F.3d at 193. Baptist argues that Relators' false records claim should be dismissed due to "fail[ure] to sufficiently allege with particularity the existence of false certifications made in connection with a claim for payment or other allegedly false records or statement." Mot. 27. This argument fails.

All certification requirements are outlined in the Complaint. *See* Compl. ¶¶ 53-54. As explained in the Complaint and applicable case law, certifying compliance with the Stark Law and the Anti-Kickback Statute is a condition of payment for Medicare and Medicaid. *See id*.; *see also Thompson*, 125 F.3d at 901-02. Therefore, any claims that Baptist submitted to Medicare or Medicaid for treatment of patients that were referred by SETMA are false claims. *See id*. As explained above, Relators have adequately alleged "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190; *supra* § (IV)(A).

Therefore, by definition, Baptist falsely certified compliance with the Stark Law and the Anti-Kickback Statute, *Thompson*, 125 F.3d at 901-02, and Relators have adequately pleaded a claim arising from false statements and records.

### D.    Relators' Complaint states a claim for conspiracy.

To plead conspiracy, a relator must allege "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid . . . and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d at 193 (quoting *United States ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 343 (5th Cir. 2008)). Baptist argues that Relators' conspiracy claim fails because "Relators fail to identify who the members of the conspiracy were or plausibly allege the formation of an 'unlawful agreement.'" Mot. 28.

The crux of the conspiracy claim against Baptist are literally two unlawful sham agreements with SETMA. Even so, under the FCA, "an express, explicit agreement is not required; a tacit agreement is enough. A conspiracy may be proven with only circumstantial evidence from a concert of action." *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 658-59 (N.D. Tex. 2020) (quoting *United States v. Shoemaker*, 746 F.3d 614 (5th Cir. 2014)). As in *Medoc*, here, "the Complaint is replete with examples of the [d]efendants working together to achieve their ends." *Id.* at 659; *see also* Compl. ¶ 8 ("In exchange for remuneration paid by Baptist . . . , SETMA's managers encouraged its employee practitioners to make referrals to Baptist."); *id.* ¶ 104 (describing Ms. Wiltz's email to Mr. Bryant at SETMA in which Ms. Wiltz stated she had "not heard from either doctor" and asked Mr. Bryant to "[l]et [her] know if [he] hear[s] from them"); *id.* ¶ 122 (quoting

Defendant Dr. Anwar's email to providers that claimed the number of admits to St. Elizabeth's hospital was "not good for [SETMA's] relationship with [B]aptist").

Additionally, the sham nature of Baptist's fake recruitment payments to SETMA forcefully support Relators' conspiracy claim. *See United States ex rel. Williams v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-130 CDL, 2014 WL 2866250, at *18 (M.D. Ga. June 24, 2014) ("Plaintiffs have adequately alleged that *the services agreements were a sham* designed to conceal the underlying purpose of the agreement: a pay-for-referrals scheme. Accepting these allegations as true, as this Court must at this stage of the litigation, the Court denies Defendants' motion to dismiss Plaintiffs' conspiracy to defraud claims.") (emphasis added). Therefore, Relators' conspiracy claim should survive.

### E.   Relators have pleaded sufficient facts to support Baptist's liability for reverse false claims.

To plead a reverse false claim, a relator must allege plausible facts showing that the defendant owed an obligation to the government. 31 U.S.C. § 3729(a)(1)(G). To allege a "reverse false claim," a relator must allege (1) an obligation to pay or transmit money or property to the Government; (2) the defendant concealed, improperly avoided, or decreased this obligation; and (3) defendant acted with knowledge. 31 U.S.C. § 3729(a)(1)(G).

The FCA defines "obligation" to be an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id*. § 3729(b)(3). In explaining the term "obligation," the Fifth Circuit has stated that "[f]or FCA liability to attach, there must be an 'established

duty' to pay or transmit money or property to the Government." *United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*, 843 F.3d 1033, 1039 (5th Cir. 2016).

In short, a reverse-false-claim under the False Claims Act arises whenever a defendant retains government-paid funds—regardless of how those funds were first obtained—that the defendant knows it is not entitled to have. *See* Joel Hesch, *Understanding the Revised Reverse False Claims Provision of the False Claims Act and Why No Proof of A False Claim is Required*, 53 UIC J. Marshall L. Rev. 461 (2021) ("Today, the 2009 version of §3729(a)(1)(G) reaches every kind of fraud scheme provided that the plaintiff can establish the defendant knows it is retaining government funds that it is not entitled to keep *regardless* of how it *obtained* them."). Based on the facts alleged above, Baptist knew (and knows) that the recruitment agreements were a sham and the remuneration it paid to SETMA in exchange for referrals was unlawful. *See supra* § (IV)(B) Thus, any claims that the government paid or continues to pay to Baptist based on tainted referrals made by SETMA need to be remitted to the government. Relators have therefore stated a claim under the reverse false claims act provision.

### F.   The Court should not dismiss Relators' TMFPA claims.

For the reasons above, Relators have more than adequately pleaded the elements of their federal FCA claims. The Texas claims are based on the same alleged facts and similar legal theories. And, just as Baptist's sham recruitment agreement anticipated Medicare referrals, they also anticipated that Relators would treat and admit Medicaid patients. Mot. Ex. 1 at 8-9 (Sections 4.5 and 7.2); Mot. Ex. 2 at 8-9 (Sections 4.5 and 7.2).

Moreover, the elements under the TMFPA are not the same as the elements under the federal False Claims Act. Namely, for purposes of the current motion, the TMFPA does not require presentment of a "false claim" for a defendant to incur liability. *See* Tex. Hum. Res. Code § 36.002(13); *United States ex rel. Govindarajan v. Dental Health Programs, Inc.*, No. 3:18-cv-00463- E, 2020 WL 3064712, at *7 (N.D. Tex. June 8, 2020) ("[T]he TMFPA's scope may 'reach[] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process.'" (quoting *United States ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp.3d 584, 606-07 (S.D. Tex. 2018), *aff'd sub nom. United States ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019)).

Accordingly, Relators' claims under Texas law "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Relators' federal claims should proceed, and the Court should exercise supplemental jurisdiction over the Texas claims.

### G.   If the Court dismisses any causes of action—which it should not—any dismissal should be without prejudice.

Baptist asks the Court to dismiss Relators' claims with prejudice. *See* Mot. 30. Under Fifth Circuit precedent, this request is without support. *See In re Am. Airlines, Inc. Litig.*, 370 F. Supp. 2d 552, 567-68 (N.D. Tex. 2005) (citing *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)); *Meyer v. Coffey*, 231 F. Supp. 3d 137, 152 (N.D. Tex. 2017) (concluding "it would be improper to render a final decision based on the sufficiency of Plaintiff's pleadings rather than the merit of her claims").

Pursuant to Rule 15(a)(2), this Court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although the Court has discretion whether to

permit amendment, "[i]n the context of motions to amend pleadings, 'discretion' may be misleading, because Fed. R. Civ. P. 15(a) 'evinces a bias in favor of granting leave to amend.'" *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000) (quoting *Martin Herend's Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d 765, 770 (5th Cir. 1999)). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* (quotation omitted).

Application of this approach is particularly appropriate in FCA cases. In such cases, "it is difficult for any plaintiff to know what a particular district judge will require by way of details in a complaint," and "[v]ariations among district judges and appellate panels can be substantial." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 784 (7th Cir. 2016) ("Reasonable minds can—and will—differ on the adequacy of the factual specificity in an allegation of fraud."). For this reason, courts routinely grant leave to file amended complaints in FCA cases. *See, e.g., United States ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*, 565 Fed. Appx. 669, 670 (9th Cir. 2014) (reversing dismissal of second amended complaint with prejudice and remanding to allow further amendment where dismissal was based on failure to provide sufficiently detailed allegations).

Here, there is no reason to believe that amendment would be futile. To be clear, Relators can add further information regarding referrals from SETMA to Baptist as well as facts surrounding Baptist's violation of its own policy surrounding the recruitment of physicians. Relators can continue adding more and more information to an already lengthy and detailed complaint—but that is neither necessary nor efficient for the litigation of this action. Relators have logically, chronologically, and expressly shown that Baptist violated

the False Claims Act and Texas law through a scheme to pay remuneration to a major referral source under false pretenses. Those sham agreements themselves recognize that Medicare and Medicaid patients would be referred to Baptist and that Baptist would bill for those patients. This case should proceed expeditiously toward trial.

## V.   CONCLUSION

For these reasons, the Court should deny Baptist's Motion to Dismiss. Alternatively, Relators request leave to amend per Federal Rule of Civil Procedure 15(a)(2).

Dated:  August 25, 2023       Respectfully submitted,

**REESE MARKETOS LLP**

By: */s/ Joshua M. Russ*
    Joshua M. Russ
    Texas Bar No. 24074990
    josh.russ@rm-firm.com
    Joel W. Reese
    Texas Bar No. 00788258
    joel.reese@rm-firm.com
    Adam Sanderson
    Texas State Bar No. 24056264
    adam.sanderson@rm-firm.com
    Andrew O. Wirmani
    Texas Bar No. 24052287
    andrew.wirmani@rm-firm.com
    Brett S. Rosenthal
    Texas Bar No. 24080096
    brett.rosenthal@rm-firm.com
    Allison N. Cook
    Texas Bar No. 24091695
    allison.cook@rm-firm.com

    750 N. Saint Paul St. Ste. 600
    Dallas, Texas 75201-3201
    Telephone: (214) 382-9810
    Facsimile:  (214) 501-0731

**MASTROGIOVANNI MERSKY & FLYNN, P.C.**

By: */s/ Joseph J. Mastrogiovanni*
    Joseph J. Mastrogiovanni, Jr.
    Texas Bar No. 13184380
    jmastro@mastromersky.com

    2001 Bryan Street, Suite 1250
    Dallas, Texas  75201
    Telephone:  (214) 922-8800
    Facsimile:   (214) 922-8801

**ATTORNEYS FOR RELATORS**

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was filed on August 25, 2023, through the ECF system, and will thereby be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

 */s/ Allison N. Cook*
Allison N. Cook
